UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE AIR CRASH NEAR NANTUCKET
ISLAND, MASSACHUSETTS, ON OCTOBER
31, 1999
-------------------------------------------------------------x  **MEMORANDUM AND ORDER**
-------------------------------------------------------------x  Case No. CV-00-1388 (FB) (KAM)
SOHEIR MAKARY, as the Proposed Personal
Representative and Administratrix of the Estate
of SAMI MAKARY, Deceased, individually and
on behalf of the next of kin,

                Plaintiff,

-against-

EGYPTAIR,

                Defendant.
-------------------------------------------------------------x

*Appearances:*

| *For the Plaintiff:* | *For the Defendant:* |
|---|---|
| JONATHAN C. REITER, ESQ. | CHRISTOPHER CARLSEN, ESQ. |
| Law Firm of Aaron J. Broder & | Clyde & Co US LLP |
| Jonathan C. Reiter | The Chrysler Building |
| Empire State Building | 405 Lexington Avenue |
| 350 Fifth Avenue, Suite 2811 | New York, New York 10174 |
| New York, New York 10118 | |

**BLOCK, Senior District Judge:**

        Sami Makary was a passenger on the EgyptAir Flight 990 which, on October 31, 1999, crashed on its way to Cairo from New York into the Atlantic Ocean, approximately sixty miles from Nantucket Island; there were no survivors. Sami's sister, plaintiff Soheir Makary, representing his estate, has brought suit seeking pecuniary and nonpecuniary damages pursuant to the Death on the High Seas Act ("DOHSA"), 46 U.S.C. app. §§ 761-768.[1] The Court conducted a bench trial on

---

[1] Since the crash occurred more than 12 nautical miles from the United States' shore, DOHSA applies. *See* 46 U.S.C. app. § 761(b).

the issue of damages on August 23, 2006.[2] The following constitutes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### A. General Background

At the time of the crash, Sami was 28 years old. He was survived by his parents, Anwar Makary and Neamat Beshay, who were then 59 and 52, respectively. In addition, Sami was survived by his sisters Samia, Soheir, Evon and Taghreed Makary, who were then, respectively, 34, 33, 31 and 26, as well as his younger brother Naser Makary, who was then 24. Sami was also survived by one of his cousins, Emad Beshay, who was raised since infancy by Sami's parents, together with their children; Emad was then 19. They each testified, either at trial or by deposition, and the Court finds their testimony credible. The bulk of the testimony was provided in court by Sami's proud father, a former member of the Egyptian Parliament and distinguished Egyptian lawyer, whom the Court finds particularly credible.

Sami was born in Egypt, and was the oldest of his parents' two sons. In Egyptian culture, the eldest son is celebrated as "the one who carries his father's name afterwards and [ ] completes his father's mission," Tr. at 17 (Test. of Anwar Makary)[3]; the eldest son "has the same responsibilities for the whole family as [the] father," *id.* at 64 (Test. of Soheir Makary), and is expected to care for his parents in their old age.

For most of his life, Sami lived in the family home in Alexandria, Egypt, with his parents, siblings and cousin Emad. He graduated from the University of Helwan with a bachelor's

---

[2]As has been the case with all other suits against EgyptAir arising from the crash, EgyptAir has chosen not to contest liability.

[3]"Tr." refers to the bench trial transcript.

2

degree in design and, in 1997, started his own import/export business in Egypt, where he employed his sister Taghreed and cousin Emad. Sami moved to the United States in December 1998 in order to develop an import/export business here. At the time of the crash, Sami was traveling back to Egypt to close his business there.

## B. Financial Contributions

After he started his business in Egypt in 1997, Sami began making varying cash contributions to his parents, siblings and cousin, and continued to do so until he died. At the time of Sami's death, Taghreed, Naser and Emad were still living in the family home in Egypt; Samia and Evon lived in separate homes in Egypt with their husbands and children; and Soheir, who was separated from her husband, lived with her children in her marital home in New Jersey.

### 1. Anwar Makary and Neamat Beshay

By 1997, Sami's father had completed his term of office as a member of the Egyptian Parliament and had returned to his prior employment as Director General of the Egyptian Customs House in Alexandria, where he earned approximately $36,000 per year. From 1997 until December 1998, Sami gave his parents 5,000 Egyptian pounds ("EGP") per month (approximately $1,470)[4] – increasing their annual household income by almost fifty percent (50%). From December 1998 until the crash on October 31, 1999 – the period Sami lived in the United States – he gave his parents $2,000 per month either directly, when his father was visiting in the United States, or through friends who traveled back to Egypt.

Considering his education and work history (in both the United States and Egypt), as well as his diligence in pursuing opportunities in the import/export industry, Sami's future earning

---

[4]From 1997 through 1999, one Egyptian pound was valued at approximately 0.29 United States dollars. *See* OANDA, The Currency Site, http://www.oanda.com.

capacity at the time of his death was significant; accordingly, it is reasonable to expect that he would have continued to give his parents at least $2,000 per month. Moreover, given his age and good health, Sami would have been able to continue to make such payments to his parents for the remainder of their lives – at the time of the crash, his father's life expectancy was 20.2 years; his mother's was 29.9 years. Given Sami's closeness with both parents, Sami obviously would have continued to give the same amount of money to either parent in the event that one predeceased the other.

Sami's parents currently live in New Jersey, sharing a home with their daughter Soheir and her children. Now retired, Sami's father receives a pension of approximately $1,100 per month ($13,200 per year).

## 2. Samia Makary

In 1997, Sami began giving his sister Samia 400 to 500 EGP (approximately $120 to $150) per month to supplement her husband's income while she was on maternity leave; Samia remained on maternity leave until 2000, one year after the crash. Sami also gave Samia 2,000 EGP (approximately $590) per year for her daughter's private school tuition; at the time of the crash, Samia's daughter was approximately five years old.

## 3. Soheir Makary

During the eleven months Sami lived in the United States, he gave an unspecified amount of money to his sister Soheir to pay for her and her children's food, clothes and incidentals after she separated from her husband; Soheir's husband continued to pay the rent. Soheir began working in 2002, and is currently employed.

## 4. Evon Makary

Sami also gave money to his sister Evon on a monthly basis. In 1997, Sami began

4

giving Evon 200 to 300 EGP (approximately $60 to $90) per month to supplement her household income; after Evon gave birth in September 1998, Sami increased his monthly contributions to 300 to 400 EGP (approximately $90 to $120), which continued for over one year until the date of the crash. Sami also gave Evon a one-time gift of 4,000 EGP (approximately $1,180) to pay for the delivery of Evon's child by Cesarean section.

### 5. Naser Makary

From the time Sami opened his business until the date of the crash, Sami gave his brother Naser approximately 5,600 EGP (approximately $1,650) per year to pay for his law school tuition and books, and an additional 300 EGP (approximately $90) per month for clothing and other incidentals; Naser continued his studies until graduation in 2003.

### 6. Taghreed Makary and Emad Beshay

After Sami opened his business in Egypt, Sami gave unspecified amounts of money to his sister Taghreed and cousin Emad, in addition to a monthly salary he paid them as employees, to help them buy personal items such as clothing.

## C. Closeness of Family

The family was extremely close, and Sami was a central figure. Sami had a strong relationship with his father, who considered Sami to be a friend and brother as well as a son. Even after Sami moved to the United States, he remained in close contact with his father through daily telephone conversations. Sami was also very close to his mother; while living in Egypt, he accompanied her to see the doctor and drove her whenever she wished to go somewhere. To his siblings and cousin Emad, Sami was a trusted confidant and advisor. Sami's death had a great physical and emotional impact on his entire family, particularly his parents – his father suffered a stroke that rendered him incapable of working; his mother became very sick and required medical

5

attention.

## CONCLUSIONS OF LAW

The parties agree that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1333, treaty jurisdiction pursuant to Article 28 of the Warsaw Convention, and that venue is appropriate pursuant to 28 U.S.C. § 1391(c).

The Court has previously discussed the damages available under DOHSA in *Freeman v. EgyptAir (In re Air Crash Near Nantucket Island, Mass., on October 31, 1999)*, 2002 WL 32302598 (E.D.N.Y. May 23, 2002), and *Kowalsky v. EgyptAir (In re Air Crash Near Nantucket Island, Mass., on October 31, 1999)*, 307 F. Supp. 2d 465 (E.D.N.Y. 2004), to which the parties are referred. As discussed in *Kowalsky*: (1) prior to April of 2000, damages under DOHSA were limited to pecuniary damages, but DOHSA was then amended, retroactive to deaths occurring after July 16, 1996, to permit recovery for nonpecuniary damages as well; (2) the amended statute defines nonpecuniary damages as "loss of care, comfort, and companionship"; (3) while this definition would include "loss of society," meaning "love, affection, care, attention, companionship, comfort and protection," it would not include compensation for "grief and mental anguish." 307 F. Supp. 2d at 468.

### A. Beneficiaries

Both before and after the 2000 amendment, an action brought under DOHSA was and is "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative." 46 U.S.C. app. § 761(a). The amendment was apparently triggered by the Supreme Court's holding in *Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217 (1996) that "loss of society" damages were not available under DOHSA, overruling a line of cases, such as the Second Circuit's decision in *Zicherman*, drawing on federal maritime law to award such damages. In light of the amendment,

6

these cases assume renewed vitality as relevant precedent in ascertaining who qualifies under the statute as a dependent relative for pecuniary and nonpecuniary awards.

In *Zicherman*, the Second Circuit defined "dependency" as "the existence of a legal or voluntarily created status where the contributions are made for the purpose or having the result of maintaining or helping to maintain the dependent in [his or her] customary standard of living." *Zicherman v. Korean Air Lines, Co.*, 43 F.3d 18, 22 (2d Cir. 1994) (citation and quotation omitted), *rev'd in part on other grounds*, 516 U.S. 217 (1996). In *Hollie v. Korean Air Lines Co.*, 60 F.3d 90 (2d Cir. 1995), *judgment vacated by Korean Air Lines Co. v. Hollie*, 516 U.S. 1088 (1996) (vacating "for further consideration in light of *Zicherman* . . . 516 U.S. 217 (1996)"), the district court, in a pre-trial ruling, had, in light of the circuit court's intervening decision in *Zicherman* (and prior to *Zicherman*'s reversal by the Supreme Court), improperly dismissed sibling claims for loss of society, requiring remand, but had nonetheless instructed the jury as to dependency to enable it to determine, *inter alia*, whether the decedent's brother would be entitled to pecuniary damages for loss of support.[5] In upholding the jury's award of pecuniary damages, the circuit court gave its approval to this charge as comporting with *Zicherman*. It read:

> In order for a relative to be dependent under the law the pecuniary contribution from the decedent must have been in whole or in part a means of maintaining the relative in the manner in which they had been living. And you must also consider whether the relative looked forward to and relied upon the continuance of decedent's contribution to maintain that standard of living. The provision of money or necessary items on a regular or systematic basis tends to support a finding of dependency.

*Id.* at 94-95. On appeal, the defendant did not challenge the jury's finding of dependency, which was

---

[5]The trial court also permitted recovery by other dependent relatives for loss of nurture and guidance, which the circuit court held, under the facts of the case, to be improper. *See Hollie*, 60 F.3d at 93.

7

supported by testimony that the decedent took his brother "shopping, bought him gifts, and gave him food," *id.* at 93; rather, it contended "that there was no basis for the jury to infer the amount of pecuniary loss." *Id.* The circuit court disagreed, finding sufficient evidence for the jury to find that decedent would have contributed "approximately" $2,000 per year in such benefits for the remainder of the decedent's working life. *Id.*

*Hollie* makes it clear, therefore, that proof of dependency and proof of loss under DOHSA – be it for loss of support or loss of society – are separate requirements; thus, as the lower court correctly noted in *Hollie* in assessing damages for loss of support, "a relative who is not a wife, husband, parent, or child of the decedent must separately establish both dependency and pecuniary loss in order to recover damages under DOHSA." *Hollie*, 1994 WL 38785, at *4 (S.D.N.Y. Feb 2, 1994).

After *Hollie*, the Second Circuit added in an unpublished summary order that its definition of dependency under *Zicherman* "clearly requires that some form of financial dependency exist between decedent and 'dependent relative.'" *Ephraimson-Abt v. Korean Air Lines*, 1999 WL 980959, at *2 (2d Cir. Oct. 17, 1999) (included in table of decisions at 199 F.3d 1322). Even if this opinion were to be accorded precedential value,[6] financial dependency does not necessarily equate to the proof of dollar loss or loss of society necessary to justify a DOHSA award for pecuniary or nonpecuniary damages.

In the present case, although Sami was not legally required to do so, he regularly gave his siblings and cousin Emad money to pay for food, clothing, extraordinary medical treatment,

---

[6] According to the Second Circuit's local rules, summary orders do not constitute formal opinions of the court and therefore cannot be cited in unrelated cases. *See* Local Rules of the Second Circuit § 0.23.

private school tuition or, in the case of Samia and Evon, to supplement their household incomes during periods of financial strain. For over two years, these contributions helped each maintain his or her standard of living. Accordingly, Samia, Soheir, Evon, Taghreed, Naser and Emad all qualify as dependent relatives within the meaning of DOHSA, and therefore, together with Sami's parents, are entitled to damages for loss of support and/or loss of society if they satisfy the requisite evidentiary standards.

**B. Pecuniary Damages**

Under DOHSA, pecuniary damages are to constitute "fair and just compensation for the pecuniary loss sustained by the [beneficiaries] and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought." 46 U.S.C. app. § 762(a). Such damages include loss of support, meaning "all the financial contributions that the decedent would have made to his dependants had he lived." *Freeman*, 2002 WL 32302598, at *2 (quoting *Oldham v. Korean Air Lines, Ltd.*, 127 F.3d 43, 53 (D.C. Cir. 1997)). "Mathematical certainty is unnecessary to prove the amount of pecuniary loss, but there must be some evidence from which the [Court] can estimate future support without engaging in conjecture." *Hollie*, 60 F.3d at 93 (citing *Shatkin v. McDonnell Douglas Corp.*, 727 F2d 202, 207 (2d Cir. 1984)).

Among the elements to consider in assessing damages for loss of support are "[t]he deceased's age, his earning capacity, his surviving beneficiaries, their ages, and his contributions to them, his condition of health, [and] his prospects of advancement." *City of Rome*, 48 F.2d 333, 337 (S.D.N.Y. 1930). Earning capacity "may be estimated from such factors as decedent's actual earnings during the period before his death, his health, diligence and work habits in general, his prospects for advancement, and the economic conditions of the industry in which he was employed."

9

*Petition of Risdal & Anderson, Inc.*, 291 F. Supp. 353, 357 (D. Mass. 1968) (citation omitted). A survivor's reasonable expectation of benefits may be measured "over the remainder of the life expectancy of the decedent or the survivor, whichever is shorter." *Complaint of Metcalf*, 530 F. Supp 446, 459 (S.D. Tex. 1981).

Pecuniary damages awarded under DOHSA must be reduced to present value through the use of a discount rate. *See In re Adventure Bound Sports*, 858 F. Supp. 1192 (S.D. Ga. 1994) (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536-37 (1983)). Since plaintiff has not presented evidence as to what that discount rate should be, the Court applies the Second Circuit's accepted two percent (2%) per year rate. *See Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 41-42 (2d Cir. 1997); *DeChico v. Metro North Commuter R.R.*, 758 F.2d 856, 860 (2d Cir. 1985). All of the following pecuniary damage awards have therefore been so discounted.

### 1. Pecuniary Damage Awards for Sami's Parents

Since Sami would have continued contributing $2,000 per month to his parents for the remainder of their lives, Sami's parents suffered a total loss of support amounting to $535,389 (discounted), based on the mother's longer life expectancy. Since DOHSA requires that each beneficiary receive a separate award in proportion to their respective loss, the Court awards Sami's father $197,000 and Sami's mother $338,389 in recognition of the difference between their life expectancies.

### 2. Pecuniary Damage Awards for Sami's Siblings and Cousin

Given the Court's conclusion that Sami's siblings and cousin Emad are dependent relatives within the meaning of DOHSA, their entitlement to pecuniary damages depends on their individual circumstances.

The Court awards Samia $2,300. This amount reflects one additional year – the

10

approximate period of time after the crash that Samia remained on maternity leave – of $150 monthly contributions and full payment of her daughter's private school tuition for that year since it is reasonable to assume that Sami would have continued to pay for his niece's tuition while her mother was on maternity leave.

The Court awards Evon $1,400. This equates to one additional year of $120 monthly contributions, a reasonable and conservative sum since Sami had been contributing to her support for more than one year prior to his death; although relevant to the issue of dependency, the Court has not factored Sami's payment for Evon's Cesarean section into its calculation of pecuniary damages since this one-time payment does not demonstrate regular contributions for ongoing medical treatment.

The Court awards Naser $8,000. This reflects the cost of Naser's remaining three years of law school education that he could reasonably expect Sami would have paid if he had lived.

Finally, as to Soheir, Taghreed and Emad, although they received some amounts of financial support, they have not been quantified; moreover, there is insufficient evidence "from which the [Court] can estimate future support without engaging in conjecture." *Hollie*, 60 F.3d at 93 (citation omitted). The Court will, therefore, only award nominal damages to each of $100 in recognition that they each suffered some financial loss. *See* Black's Law Dictionary 418 (8th ed. 2004) (defining nominal damages as "[a] trifling sum awarded when a legal injury is suffered but when there is no substantial loss or injury to be compensated").

## C. Nonpecuniary Damages

Sami's parents and dependent relatives are each entitled to nonpecuniary damages because they have suffered from the loss of Sami's care, comfort and companionship, meaning, once again, his "love, affection, care, attention, companionship, comfort, and protection," commonly

referred to as loss of society. *Kowalsky*, 307 F. Supp. 2d at 468.

Awards for nonpecuniary losses should be discounted to present value, but "this discounting should not be conducted with the statistical precision used for discounting future earnings." *Id.* (citing *Oliveri v. Delta Steamship Lines,* 849 F.2d 742, 751 (2d Cir. 1988); *Ramirez,* 112 F.3d at 42 n.5). Rather than conduct a precise statistical calculation, the Court follows its approach in *Kowalsky* by factoring the time value of money into its awards. *See id.* at 469.

### 1. Nonpecuniary Damage Awards for Sami's Parents

The parties are far apart in their proposed awards. Plaintiff asks that each parent be awarded $1 million, together with prejudgment interest. Defendant submits that damages should be assessed at $200,000 per parent, apportioned between past and future damages based on the life expectancy of each parent, and that a discount rate of 5% should be applied to any future damages.

"Damage awards in analogous cases provide an objective frame of reference, but they do not control the Court's assessment of individual circumstances." *Kowalsky,* 307 F. Supp. 2d at 469 (quoting *Moore v. M/V ANGELA,* 353 F.3d 376, 384 (5th Cir. 2003)). Both federal and state court decisions can shed light on the issue. *See Mazyck v. Long Island R.R. Co.,* 896 F. Supp. 1330, 1337-38 (E.D.N.Y. 1995) (surveying awards in state court cases to determine whether award excessive in federal question case).

If the Court were to rely on cases involving the loss of a parent, its prior decision in *Kowalsky* would provide an appropriate guidepost. *See* 307 F. Supp. 2d 465 (awarding each adult Kowalsky child $180,000 for loss of father and $200,000 for loss of mother). The loss of a child, however, cannot be equated to the loss of a parent. Without marginalizing the impact of the death of a parent on a child, a child expects to survive his or her parent; no parent ever wants to live to

bury his or her child.[7]

*Bissett v. Pan Am. World Airways, Inc.*, No. 89 Civ. 1460 (E.D.N.Y. Feb. 20, 1996), which plaintiff cites as its best case, is the only decision the Court has found that applies federal law to assess parental loss of society for the death of a child in a commercial aviation accident.[8] There, the district court upheld a $2 million jury award for loss of society to parents of a 21-year-old college student killed in a plane crash at Lockerbie, Scotland. While recognizing those facts are similar to the facts here, *Bissett*'s value as a comparator is somewhat undermined because (1) most of the cases it relies upon involve commingled awards for the loss of spouse and parent, *see, e.g., Bainbridge v. Pan Am. World Airways (In re Air Crash at Lockerbie, Scotland on December 21, 1998)*, No. 89-CV-386 (E.D.N.Y.)[9] (affirming jury award to decedent's spouse and child of $1.25 million for loss of society), *vacated in part on other grounds*, 37 F.3d 804 (2d Cir. 1994); and (2) taken together, the cases demonstrate an extremely broad range of possible awards, *compare Porter v. Pan Am. World*

---

[7]The primacy of a parent's love for his or her child can be found in many cultures and religious traditions. For example, the first "love" of the Bible – that is, the first appearance of the Hebrew verb "to love" – is the love of Abraham for his son Isaac. *See Genesis* 22:2, *in Etz Hayim: Torah and Commentary* 118 (David L. Lieber ed., The Jewish Publication Society 2001) ("And He said, 'Take your son, your favored one, Isaac, whom you love . . . .'").

[8]Since the crash in *Bissett* occurred over land rather than on the high seas, DOHSA was not applicable. Although not clearly stated in the decision, it appears that the *Bissett* court applied general maritime law to determine damages. The Court believes that the judgment in *Bissett*, if appealed, would have been vacated in light of the Supreme Court's holding in *Zicherman v. Korean Air Lines Co.* that general maritime law should not be applied to Warsaw Convention cases; rather, courts should apply the law that would govern in the absence of the Warsaw Convention. *See* 516 U.S. 217, 229 (1996). Accordingly, for a crash that occurs more than 12 nautical miles from shore, DOHSA applies; for crashes occurring on land, the law of that place (i.e., state) applies. *See* 46 U.S.C. app. § 761(b) ("In the case of a commercial aviation accident . . . occurring on the high seas 12 nautical miles or closer to the shore of any State . . . the rules applicable under Federal, State, and other appropriate law shall apply.").

[9]Decision unavailable.

13

*Airways*, No. 89-CV-337 (E.D.N.Y.)[10] (affirming jury award to decedent's spouse and child of $200,000 for loss of society), *with Holton v. Sisters of the Third Order of Saint Francis*, 618 N.E.2d 334 (Ill. App. Ct. 1993) (affirming jury award of $1.2 million to spouse and $5 million to children for loss of society), *appeal denied*, 650 N.E.2d 985 (Ill. App. Ct. 1993).

Given these limitations, the Court looks to state court decisions in which loss of society for the death of a child was awarded under the applicable state wrongful death statute. *See, e.g., Haley v. Pan Am. World Airways*, 746 F.2d 311 (5th Cir. 1984) (finding $350,000 award to each parent for loss of love and companionship of 25-year-old son killed in commercial plane crash was excessive by Louisiana standards; ordering new trial unless parents agreed to remittitur of their respective claims to $200,000); *Kirk v. Ford Motor Co.*, 147 Mich. App. 337 (Ct. App. 1986) (affirming jury award of $3 million to parents and sibling for loss of society of 19-year-old man who died from fatal burn injuries due to car gas tank explosion); *Gutierrez v. Exxon Corp.*, 764 F.2d 399 (5th Cir. 1985) (affirming jury award of $250,000 to parents of adult child who died as result of accident from working on oil well); *May v. City of Grosse Pointe Park*, 122 Mich. App. 295 (Ct. App. 1983) (affirming jury award of $1,145,000 to parents and siblings for loss of society of 13-year-old boy struck and killed by City garbage truck).

Of these state court decisions, the most factually similar is *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849 (Tex. Ct. App. 1983), however, it is over 20 years old. There, the Texas intermediate appellate court affirmed a jury award of $500,000 to a mother for the loss of society of her 13-year-old son who died of accidental electrocution. The decedent was his mother's only child, and had a "close, affectionate relationship with his mother." *Id.* at 855.

---

[10]Decision unavailable.

Sami's parents were similarly very close to Sami during his life, and their loss of care, comfort and companionship was heightened by the loss of their eldest son, a central figure in the Egyptian family and, certainly, a central figure in the Makary family. Taking all relevant factors into consideration, the Court awards Sami's father $630,000 and his mother $680,000; these sums reflect the difference between their life expectancies.[11]

## 2. Nonpecuniary Damage Awards for Sami's Siblings and Cousin

The Court is not aware of, nor do the parties cite, any prior awards of nonpecuniary damages to a decedent's dependent relatives; nonetheless, since Sami's siblings and cousin are each dependent relatives, they are entitled to nonpecuniary damages because of the closeness of their relationships with Sami. The Court awards each $125,000, treating their losses as identical considering the similarly important role that Sami played in each of their lives.

## D. Prejudgment Interest

Prejudgment interest should be awarded in DOHSA cases, absent exceptional circumstances, in order to make an injured party whole. *See id.* (citing *Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 593 (2d Cir. 1998)). "[T]he rate of interest used in awarding prejudgment interest rests firmly within the sound discretion of the trial court." *Ingersoll Milling Mach. Co. v.*

---

[11]The Court notes that the 2000 amendment states that nonpecuniary damages are "additional compensation." 46 U.S.C. app. § 762(b)(1). Taken literally, this would preclude awarding such damages if pecuniary damages were not first awarded. This could not have been Congress' intent since it would mean, for example, that children who were not economically dependent on their parents, such as in *Kowalsky*, could never recover for the loss of their parents care, comfort and companionship. The phrase "additional compensation" logically should be taken to mean that nonpecuniary damages are simply an additional measure of damages to which a wife, husband, parent, child, or dependent relative may be entitled to receive. *See Watt v. Alaska*, 451 U.S. 259, 266 (1981) ("[A]scertainment of the meaning apparent on the face of a single statute need not end the inquiry. . . . The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect.").

15

*M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987) (citation omitted). In *Kowalsky*, EgyptAir agreed to a prejudgment interest rate of five percent (5%). *See* 307 F. Supp. 2d at 471. Since neither party in this case presented evidence to support a different rate, the Court, in its discretion, applies the same 5% rate, compounded annually, to its damage awards.[12]

## CONCLUSION

Awards will be paid to the respective beneficiaries as follows:

|    |                 | Pecuniary | Nonpecuniary | Total       |
|----|-----------------|-----------|--------------|-------------|
| 1) | Anwar Makary    | $197,000  | $630,000     | $827,000    |
| 2) | Neamat Beshay   | $338,389  | $680,000     | $1,018,389  |
| 3) | Samia Makary    | $2,300    | $125,000     | $127,300    |
| 4) | Soheir Makary   | $100      | $125,000     | $125,100    |
| 5) | Evon Makary     | $1,400    | $125,000     | $126,400    |
| 6) | Taghreed Makary | $100      | $125,000     | $125,100    |
| 7) | Naser Makary    | $8,000    | $125,000     | $133,000    |
| 8) | Emad Beshay     | $100      | $125,000     | $125,100    |

---

[12]"In order to adequately compensate the plaintiffs for their deprivation of the use of the award for the . . . duration of this litigation, prejudgment interest should be compounded annually." *Hollie v. Korean Air Lines Co.*, 834 F. Supp. 65, 71 (S.D.N.Y. 1993) (citing S. Rep. No. 97-275, at 1, 12, 35 (1981), *as reprinted in* 1982 U.S.C.C.A.N. 11, 22, 44).

Prejudgment interest will be calculated at a rate of 5%, compounded annually. Such interest will run on the full amount of damages from the date of the crash on October 31, 1999 to the date of entry of judgment.[13]

**SO ORDERED.**

/signed/

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 27, 2006

---

[13] The Court is unaware of any prior payment by EgyptAir to Sami's parents, siblings or cousin; if any such payment has been made, the awards to each shall be adjusted accordingly. *See Kowalsky*, 307 F. Supp. 2d at 471 (applying prejudgment interest to remaining sums due to beneficiaries after subtracting prior payments by EgyptAir from total awards).

17